Good morning, Your Honors. Good morning. I'm Jeffrey Baird. May it please the Court, I'm representing Mr. Jamtaas. This is a case where all of the examining physicians and treatment providers made findings that the claimant, Mr. Jamtaas, could not sustain or tolerate stresses of an eight-hour workday in the workplace. The ALJ, in fashioning the RFC, relied upon primarily two state agency physicians who only reviewed records, who never saw the claimant in person, Dr. Reigetz and Dr. Van Dam. For his part, Dr. Reigetz relied entirely, we can tell in his narrative, he relied entirely on Dr. Moslyn Likens' opinion. He simply took bits and pieces of what she said and put that into his narrative RFC assessment. I have a question. Initially, he was claiming to be disabled as of 2001, and then he changed it to 2009? Right. He abandoned his Title II claim and simply went with the Title XVI SSI application date as his onset. And then did he go to work for two months right after that? He worked for two months mowing lawns, but then he got sent to prison for domestic violence, or jail for domestic violence for five months. So isn't that a reflection that he could engage in work despite his asserted disabilities? The ALJ found no substantial gainful activity at Step 1, so the ALJ ruled the lawn mowing job out as representing participation in the world of work. But part of it is he went in and out of jail, too. I mean, he went to prison and he went to jail for fines and things like that, right? During the period at issue, he went to jail for five months in August to December 2010 for the domestic violence. But that may be related to the social dysfunctioning and the personality disorder, which is well-documented by all of the examining physicians. And that's why the most important doctor actually is Moslyn Likens, who reported fairly early in 2009. She found he had laborious efforts doing what's called serial sevens, counting backwards. She watched him struggle as he counted on his fingers under the stress of the task. And she drew the conclusion he would have trouble with routine stress. She also found he had tried to manipulate her. She thought, well, he's not giving me a full story. I don't know what he's up to. But she saw through it, and she connected it with the personality disorder. And she found it was likely to cause disruptions working with other people. The manipulative behavior would be disruptive. Well, let me ask you this. I mean, I think one of the other things that you – the last – is it Dr. Wingate? Yes. Is the only one that makes an actual diagnosis of PTSD. True. But how do you respond to the commissioner's argument that even if the ALJ erred in determining that Jamtas didn't have PTSD, it was harmless error because you haven't pointed to any limitations due to PTSD that should have been accounted for in Jamtas' RFC. So what additional limitations based on PTSD should have been included? Well, Dr. Wingate relied on objective testing, the personality assessment inventory, the PAI. But that's not really what – in the RFC. Yeah. What – even if he didn't call it PTSD. I mean, everyone – even the people that don't diagnose him with PTSD have some of the same – they note some of the same things. You know, everyone notes that he's got some social problems. But it's – is it moderate? Is it – you know, where does it fall on the scale? But so in the RFC, what – you haven't pointed anything out that wasn't considered. Well, PTSD is a form of anxiety disorder. All right, but it has components that manifest itself. True. And so what wasn't considered in the hypothetical? Well, Dr. Wingate did cite PAI results regarding anxiety, and she ultimately found he couldn't tolerate – he couldn't maintain appropriate behavior in a workplace and that he couldn't tolerate sustaining eight-hour days of stress. But the ALJ did not accept that restriction. True. When he was analyzing Dr. Mossman-Lykins' opinion, he generally agreed with what she said but took issue with the fact that Mr. Jomtas would have difficulty handling routine stresses. Because of the evidence in the record that he had engaged in jobs that ended for reasons unrelated to his supposed difficulty handling routine stresses. So why was not that a legitimate reason for rejecting that portion of Dr. Mossman-Lykins' opinion? Most of the jobs referred to are prior to the period at issue. And I would argue that domestic violence and so forth are the sort of social problems associated with the anxiety disorder and the personality disorder more especially. Well, those are all arguments. I agree. But the ALJ gets to listen to all of those arguments, gets to listen to all of those doctors, and gets to consider what her testimony from Mr. Jomtas, gets to consider his work history, what else is going on with his life. I think there's a constant background to apparently he had a not, I don't know, a girlfriend for what the ALJ considered to be a significant period of time. He had worked as the groundskeeper. I guess he was able to buy coffee, interact appropriately with examiners, and keep in contact with his parents and had this girlfriend and all of that. So the ALJ seemed to put some weight on that, which is what the ALJ can. So why isn't this just a situation of you have a lot of doctors, you have a lot of testimony, and that the ALJ went through all of it and didn't buy all your arguments? Well, the doctors are the ones with the medical opinions. They're the ones who did the medical testing, and especially Dr. Wingate doing the personality assessment inventory and using those results to fashion her various marked limitations and marked symptomology that she found. So the doctors would know more. So your argument is that the record compels that the ALJ had to accept everything that Dr. Wingate said hook, line, and sinker. He couldn't rely just on daily activities, which were not reflective of an eight-hour workday. In fact, none of the items you cited or the ALJ cited added up to sustaining stress over an eight-hour day. But that's the ALJ's function. True. To look at all of the medical evidence and to use that evidence to come to a disability determination. It's not the doctors who come up with the disability determination. That's solely the function of the ALJ. That's true, but ALJ has to premise the decision on substantial evidence in the medical record. Right. And in the medical record, both Dr. Rigerts and Dr. Van Damme were derivative doctors. They relied on record review. And Dr. Rigerts relied exclusively on Dr. Moslin-Likens. And again, she found great laborious trouble counting backward by seven. That's when she said, along with all the other factors, he can't tolerate routine stress. He's not good at routine stress. But the ALJ was not required to accept that. True. But there's no medical evidence in the end, no substantial medical evidence that supports the ALJ, because the reviewing physicians can't provide substantial evidence when they merely rely on the prior findings but simply come to different conclusions. But if that determination is inconsistent with the other evidence in the record, namely his ability to function, why wouldn't that sustain the ALJ's determination? The ALJ can look at his daily activities, for example. But again, they were fairly modest. He lived in the woods. He slept in a car for a while. He lives at the structured housing, the clean and sober housing. He lived with other people, I think, like 15 other individuals. I mean, that would be a stressor if you were unable to. That would wig me out. And I'm functioning at this job, so. Well, he escapes them every day, he leaves them every day, and he knows them. They aren't the general public. Remember, riding the bus, he couldn't sit by people. He couldn't be on the bus when it was crowded. So the question is, does that constitute tolerance of incidental co-worker contact or incidental social interactions? Maybe not for an eight-hour day, though. That's the factor the ALJ is not focusing on in the medical opinions. Well, you did have a hypothetical, I think, of considering an employee who was unable to maintain concentration and complete tasks one-third of the workday. And so the ALJ did hear that hypothetical, and apparently there was evidence presented that said, well, if you can't concentrate a third of the day, then you can't work. So it's not that the ALJ didn't hear it, and the ALJ had before it, that if the ALJ had believed that. But I guess what support in the record shows that that hypothetical describes Mr. Jamtas? Both Dr. Moslin-Likens' opinion and the Dr. Wingate's opinion, especially. Those are the two examiners who saw him in person who found he couldn't tolerate routine stress. Now, do the other opinions support that? Yeah. Lewis Brown is a little earlier than the peer review. They all say that he couldn't concentrate for a third of the day? No, they said he couldn't withstand stresses throughout a workday. He couldn't tolerate stress. That's the basic line they kept using. Dr. Lewis, respond appropriately and tolerate pressures and stress. Dr. Brown, tolerate pressures and expectations. And Ms. DeBoer, again, she was not a doctor, but she made observations, all related to inability to tolerate stress for long periods. And each of the daily activities the ALJ cited or relied on never added up to the stresses of a sustained competitive work. And that was the concern the doctors had. But again, I want to point out, under the rule in Murray v. Heckler and later in Orne v. Astru, the reviewing physicians cannot provide substantial evidence where they come to different conclusions but rely on the same findings as examining or treating physicians. If I may, I'll reserve the rest of my time to refer back. All right. You may. We'll hear from the government. Good morning. Good morning, Your Honors. David Burdette representing Carolyn Colvin, the Commissioner of Social Security. Almost everything that I had wanted to say was brought out in the questioning. Well, why don't you talk about Dr. Wingate then? Because Dr. Wingate was the most recent medical examiner and occurred shortly before the hearing of the ALJ. And so I guess my question's about, was that a she or a he? She's a she. She. Yeah. That why isn't her report entitled to greater weight, especially since most of the other reports were more than a year old? And then also, I think the ALJ said that Dr. Wingate was relying on Jantz's self-report rather than her objective observations. But if you look at her report, she did check boxes indicating that she personally had observed symptoms of depressed mood, anxiety, avoidance, intrusive thought, anger, and distrustful. So it looks like she did more than just his self-report. So what about if I look at both, you know, if you consider the recent and the ALJ seem to have slightly mischaracterized the value of what Dr. Wingate was doing? I think that's right, Your Honor, although I think there is a point to be made that, to a certain extent, any psychiatric examination relies, to some extent, on the patient's self-report. But without getting bogged down in that, I think that the ALJ did give short shrift to Dr. Wingate's report and that if this were just about a contest of doctors, then Mr. Baird would be right  and not to what he calls the derivative state agency doctors. But it's not just about that. The doctors' reports in all of these Social Security cases are only one piece of the puzzle. And the ALJ is empowered and has the duty to look at the whole picture. And doctors may not know everything that happened in a claimant's life, and they certainly don't know everything that emerges on testimony. It goes all the way back to, and Mr. Baird is correct in the rule of Oren v. Hester, but it goes all the way back to Lesser v. Chater that what he calls a derivative doctor, a state agency doctor that is not a personal examiner, can provide substantial evidence if that evidence is consistent with other substantial evidence in the record. And the other substantial evidence in the record here is that Mr. Jamtas worked at multiple jobs and left them for reasons that had nothing to do with any disability. And in particular, he worked at the groundskeeper job for a couple of months in 2010 when his alleged onset of disability was 2009, so he worked during his alleged period of disability. If I were the lawyer, I wouldn't be very happy about him going off and getting that job right after he filed disability. No, no, don't do that, client. But at any rate, he worked at that job, and he didn't leave it because of a disability. So who are the derivative doctors? When you say the derivative doctors, who are you speaking about? Well, I regret picking that up. That was Mr. Baird's phrase. But I'm referring to Dr. Regetz and Dr. Van Dam, the state agency. Okay, who were non-examining. Correct. Okay, so that's what, and then the other ones did actually see Mr. Jamtas. Correct. And I know that Dr. Wingate examined him, Dr. Moslin-Likens examined him twice or three times, twice at least in 2009. Dr. Brown examined him. And they all said that he had some degree of mental limitation, some degree of what you might call difficulty in dealing with stresses that come about. Their checkboxes, to refer to the checkboxes, they checked different boxes. Some of them said that he had moderate limitations. Some of them said that he had marked limitations in this or that. The ALJ came to the RFC conclusion with regard to his mental limitations that he can perform simple routine tasks, follow short, simple instructions, do work that consists of simple duties that can be learned on the job in a short time period, limited to occasional interactions with co-workers and supervisors, not in a cooperative or team effort, only occasional work setting changes, he cannot deal with the general public as in a sales position or where they are frequently encountered, incidental contact with the general public, however, is not precluded. And I think that when you look at the evidence of his life, where he worked successfully as a groundskeeper for a couple of months, where he lives with these 15 people in the house, besides him, where he can ride the bus, he can go into a McDonald's and deal with people in the ordinary, everyday incidental contacts that we all have with one another in life, I think that the ALJ's RFC finding is a reasonable... Well, what did he say about the girlfriend? He had a girlfriend, right? Yeah, and the ALJ pointed out that he had a girlfriend for a year and a half. I actually don't put a lot of weight on that, to tell you the truth, because lots of people can have relationships that, gosh, you just don't know about. They're dysfunctional. Yes, yes. Yeah, I wouldn't want to rest it on the fact that he had a relationship for a year and a half. But he did do a lot of the ordinary incidental contact with people that we have in everyday life, and I think that his limitations are reasonably accommodated in the ALJ's RFC finding. Did I make your argument? Oh, I'm sorry. Go ahead. No, you go ahead. What's his level of education? I don't know, Your Honor, because that was an inconsistency. Perhaps counsel can tell us. Yes, that was an inconsistency in his reporting. So did I make your argument at Step 2 when there was no PTSD? Apparently the ALJ didn't say PTSD, and Dr. Wingate, I think, was the only doctor that actually made that diagnosis. Is there anywhere in the record that even if you assume that he had PTSD and what Dr. Wingate said about him, were those factored in? Is there anything that wasn't factored in in the two hypotheticals? I don't think so. I think it was factored in, and that is okay. Step 2, as you know, is a label. It's a screening process to determine whether there are any severe impairments at Step 2. He has severe impairments. Okay, we move on in the process. Now, the ALJ could not have completely ignored all the limitations, but I think that when you look at the record, it's fair to say that PTSD, none of the other doctors say that he has PTSD. They ascribe his limitations to something or other, but Dr. Wingate is the only one to label it as PTSD. Well, if he had stopped at two and disregarded those, would that be problematic here? Yes, it would. I think it would. But I think that he goes on, and I think he accommodates all the actual limitations that that may lead to. I think that he accommodates them in the RFC finding. I think Counsel for the Appellant basically said that all of the doctors said he couldn't work a third of the time. What's your... Well, I... It was that hypothetical. I asked him what supports that, and he said, well, all of the doctors. I don't think that's correct. I stand to be corrected, but I'm pretty sure that Dr. Moslem-Likens did not say that. Thank you. Thank you, Your Honor. Thank you. It appears there are no further questions for you. Rebuttal. Yes, Your Honor. The education level is consistent. He earned a GED eventually. The problem with all of the medical evidence, all the doctors who examined, is that he can't tolerate stresses or sustain eight-hour work days. None of the daily activities shows that he could do that. Was the groundskeeper job fewer than eight hours? We don't know. It's not explained in the record. But we know that he lost the job after two months for reasons of domestic violence, which one could reasonably connect with the personality disorder. Well, but no one has. Well, Dr. Likens, the first one, Dr. Likens said she observed all kinds of personality manipulation, and she reviewed that and factored it in as an impairment that would cause disruption in the workplace. So it's not a direct connection, but it's in the same vein as the findings that Dr. Likens found on stress intolerance and the inability to function well with others. The RFC is defective in that it doesn't account for inability to sustain eight-hour days or tolerate stresses, and all of the doctors who examined him found that. It's important with Dr. Wingate. She cited the PAI on factors that would be related to the PTSD, but most importantly she connected those with stress intolerance on each of the symptoms that she discussed. She said she observed it, but she also quoted from the PAI, and it would be related to the factors such as distrustfulness of others, vigilance, startle response, and those are factors that she found would be disruptive in the workplace, and she did connect it to PTSD and the PAI. If there's no further questions, I'll rest. There's not. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court. That completes our calendar for the day and for the week. We are adjourned. All rise.
judges: Hawkins, Rawlinson, Callahan